That portion of the order of the Circuit Court appealed from, is affirmed.— *Wisconsin Legal News.*

## HUGHES *v.* PERCIVAL.

### (*House of Lords, June, 1883.*)

1. ADJOINING OWNERS—PARTY WALL—LIABILITY OF OWNER FOR ACT OF CONTRACTOR. A person who does work on his own land which necessarily exposes his neighbors to risk, is bound to take all reasonable precautions to protect them from injury, and he is not freed from this liability by the fact that he has employed a contractor, if an injury is in fact caused, though by the unauthorized and improper act of the contractor's workmen.

2. If the work done is hazardous as a whole, the liability extends to all parts of the work, even if not necessarily hazardous in themselves apart from the rest.

This was an appeal from the judgment of the majority of the Court of Appeal (Baggallay and Brett, L. JJ., Holker, L. J., dissenting,) affirming a judgment of the Queen's Bench Divis-

ion (Lord Coleridge, C. J., Manisty and Bowen, J. J.,) discharging a rule *nisi* for a new trial. The case is reported in 9 Q. B. Div., 441, and 46 L. T. Rep. (N. S.) 677.

The action was brought by the respondent against the appellant to recover damages for negligence under the following circumstances: The defendant was the owner of two houses at the corner of Panton street and the Haymarket, abutting on the east on a house of the plaintiff in Panton street, and on the south on a house in the Haymarket, belonging to one Barron. The defendant wished to pull down his houses and to erect a new house on the site, and employed a competent architect to prepare plans and to superintend the work, and a competent builder to carry it out. In the course of the operations, girders to support the defendant's new house were fixed into the party-wall between his house and that of the plaintiff. When the work was nearly completed, some of the workmen, who were employed in fixing a staircase, cut into the party-wall between the defendant's house and Barron's for that purpose. This act was not permitted by the plans or specifications, and was objected to by the architect when he discovered it. The wall was old and rotton and gave way, and in consequence, the girders which had been fixed in the other party-wall were let down, and that wall and the plaintiff's house were damaged. The case came on for trial before Manisty, J., and a special jury, and at the conclusion of the opening address of the defendant's counsel, the learned Judge said that even if all that had been opened were proved, it would be no defense to the action, and directed a verdict for the plaintiff. The defendant obtained a rule *nisi* for a new trial, which was discharged as above mentioned.

Philbrick, Q. C., and Kingsford, for the appellant, contended that the plaintiff's house was a new one, and that he had consequently no prescriptive right to support, and he must show that reasonable precautions were neglected. (*Bower* v. *Peate,* 1 Q. B. Div., 321; 35 L. T. Rep., N. S., 321.) But here there was no interference with the plaintiff's property, and no duty on the defendant to take special precautions, for at the time of the accident, the dangerous part of the work had been completed, and what was being done was entirely collateral to it, and was

moreover unauthorized by the defendant. They cited: *Dalton* v. *Angus*, (6 App. Cas., 740; 44 L. T. Rep., N. S., 844;) *Ellis* v. *Sheffield Gas Company*, (2 E. & B., 767;) *May* v. *Burdett*, (9 Q. B., 101;) *Rylands* v. *Fletcher*, (L. Rep., 3, H. L., 330; 19 L. T. Rep., N. S., 220;) *Gray* v. *Pullen*, (5 B. & S., 970; 11 L. T. Rep., N. S., 569;) *Allen* v. *Haywood*, (7 Q. B., 960;) *Steel* v. *Southeastern Railway Company*, (16 C. B., 550;) *Gayford* v. *Nicholls*, (9 Ex., 708.)

Webster, Q. C., and M'Call, for the respondent, maintained that the facts showed that the hazardous operations had not ceased, and therefore the defendant was still liable. (*Tarry* v. *Ashton*, 1 Q. B. Div., 314; 34 L. T. Rep., N. S., 97.) The work must be considered as a whole, and it was dangerous.

Kingsford, in reply, argued that the contention of the respondents put the defendant's duty too high; he is bound only to take reasonable precautions; it is going too far to say that he does the work at his peril; he is not bound to provide against all possible contingencies. (2 Hillard on Torts, 545;) *Gilbert* v. *Beach*, (4 Duer, 423, an American case;) *Milligan* v. *Wedge*, (12 A. & E., 737;) *Lemaitre* v. *Davis*, (19 Ch. Div., 281; 46 L. T. Rep., N. S., 409;) *Pearson* v. *Cox*, (2 C. P. Div., 369; 36 L. T. Rep., N. S., 495.

Lord Blackburn referred to *Laugher* v. *Pointer*, (5 B. & C., 547,) and *Quarman* v. *Burnett*, (6 M. & W., 499.)

At the conclusion of their arguments their Lordships took time to consider their judgment.

June 4.—Their Lordships gave judgment as follows:

LORD BLACKBURN.—My Lords: This is an appeal against an order of the Court of Appeal dismissing an appeal from an order of the Queen's Bench Division discharging a rule obtained by the defendant, to enter judgment on the ground that the Judge ought to have directed a verdict for the defendant, or that there should be a new trial. The first point to be considered is, what was the relation in which the defendant stood to the plaintiff? It was admitted that they were owners of adjoining houses between which was a party-wall, the property of both. The defendant pulled down his house and had it rebuilt on a plan which involved in it the tying together of the new building and the party-wall which was between the

plaintiff's house and the defendant's, so that if one fell the other would be damaged. The defendant had a right so to utilize the party-wall, for it was his property as well as the plaintiff's; a stranger would not have had such a right. But I think the law cast upon the defendant, when exercising this right, a duty towards the plaintiff. I do not think that duty went so far as to require him absolutely to provide that no damage should come to the plaintiff's wall from the use he thus made of it; but I think that the duty went so far as to require him to see that reasonable skill and care were exercised in those operations which involved a use of the party-wall, exposing it to this risk. If such a duty were cast upon the defendant, he could not get rid of the responsibility by delegating the performance of it to a third person. He was at liberty to employ such a third person to fulfill the duty which the law cast on himself, and if they so agreed together, to take an indemnity to himself in case of mischief coming from that person not fulfilling the duty which the law cast upon the defendant; but the defendant still remained subject to that duty and liable for the consequences if it was not fulfilled. This is the law, I think, clearly laid down in *Pickard* v. *Smith*, (10 C. B., N. S., 473,) and finally in *Dalton* v. *Angus*, (6 App. Cas., 740; 44 L. T. Rep., N. S., 844.) But in all the cases on the subject there was a duty cast by law on the party who was held liable. In *Dalton* v. *Angus*, and in *Bower* v. *Peate*, (1 Q. B. Div., 321; 35 L. T. Rep., N. S., 321,) the defendants had caused an interference with the plaintiff's right of support. Cockburn, C. J., it is true, in *Bower* v. *Peate*, after showing this, says: "The answer to the defendant's contention may, however, as it appears to us, be placed on a proper ground, namely, that a man who orders a work to be executed, from which, in the natural course of things, injurious consequences to his neighbor must be expected to arise unless means are adopted by which such consequences may be prevented, is bound to see to the doing of that which is necessary to prevent the mischief, and cannot relieve himself of this responsibility by employing some one else, whether it be the contractor employed to do the work from which the danger arises, or some independent person to do what is necessary to prevent the act he has ordered to be

done from becoming wrongful." I doubt whether this is not too broadly stated. If taken in the full sense of the words, it would seem to render a person who orders post-horses and a coachman from an inn, bound to see that the coachman, though not his servant, but that of the innkeeper, used that skill and care which is necessary when driving the coach to prevent mischief to the passengers. But the Court of Queen's Bench had no intention, and, indeed, not being a Court of error, had no power to alter the law laid down in *Quarman* v. *Burnett*, (6 M, & W., 499.) But if I am right in thinking that the defendant, in consequence of his using the party-wall of which the plaintiff was part owner, had a duty cast upon him by the law similar to that which in *Dalton* v. *Angus*, (*ubi supra*) it was held was cast upon the defendant in that case, in consequence of his using the foundations on which the plaintiff had a right of support, it is not necessary now to inquire how far this general language should be qualified. I do not think the case of *Butler* v. *Hunter*, (7 H. & N., 826,) is consistent with my view of the law. I do not know whether the Court of Exchequer meant to deny that such a duty was cast upon the defendant in that case, or meant to say that he might escape liability by employing a contractor. If either was meant by the Court of Exchequer, I am obliged to differ from them. If this be so, the question is, I think, narrowed to this: Was the operation during which the defendant's duty required him to see that reasonable skill and care should be used over, at the time when those engaged in the work cut into the party-wall between the defendant's house and Barron's; for it is not disputed that there was a want of skill in doing this and that it caused the damage; and it is not disputed that the men who did it were intending to carry out the work on which they were employed. The defense opened at the trial, I think, was directed to this, that the contractor was bound not to do anything without written authority, and that there was no authority at all to cut into the party-wall. I do not think that that could prevent the act which was done from being in breach of the defendant's duty. Holker, J. L., however, thought, as I understand him, that the whole of the operation connected with the use of the plaintiff's party-wall were over, and that the contractor's

men were engaged in a subsequent independent job, and that the defendant was under no further duty then than he would have been if, after the house was finished, he had brought in carpenters to repair a wooden staircase. I cannot, however, take this view. I regret that the case was stopped in the counsel's opening, for I feel convinced that if the evidence had been gone into, this view of the facts could not have been taken. As it is, I do not think it necessary to say more of the view of the law taken by the late Lord Justice than that I think it well worthy of consideration in any case where the facts are as he seemed to suppose. I think that the order appealed against should be affirmed, and the appeal dismissed with costs.

LORD WATSON.—My Lords: In this case I have had great difficulty in forming an opinion satisfactory to my own mind, not because of any doubt as to the law, but because I do feel doubtful whether I rightly apprehend the facts which I ought to assume as the basis of my judgment. It is very much to be regretted that the case was not submitted to the jury. Had that course been followed, it is certain that the facts would have been ascertained, and it is highly probable that no question of law would have arisen. As it is, we are left to discover the facts upon which our judgment must depend, from a very long and argumentative statement made by the appellant's counsel, and in regard to the true import of that statement, the parties at the bar widely differed. Accordingly we hear quite as much argument about the meaning of what was said to the jury as upon the law of the case. In the Court of Appeal the result of this unsatisfactory state of matters was, that Holker, L. J., took a somewhat different view of the facts from his colleagues, which led him to a different result in law. Had your Lordships not thought otherwise, I should have been inclined to send the case back to the jury for their determination. It is, in my opinion, neither satisfactory nor expedient to decide important questions of law upon a hypothetical statement of facts, especially when the litigant parties are not agreed as to the meaning of the statement. Here the appellant says that his counsel meant to indicate to the jury that he was about to prove, or would try to prove certain facts; the respondent, on the other hand, says that the statement of the appellant's counsel,

when carefully read and construed, indicates that he meant to prove something materially different from those facts. I feel a great dislike to criticising the oral statements of a counsel as if they were part of the record, and conceive that I am bound to construe them most liberally in favor of his client. I rather think that Holker, L. J., must have been to some extent influenced by these considerations in putting a different construction upon the language from that which was adopted by the other members of the Court of Appeal. Although I do not agree with the view taken by him, I am not certain that I take precisely the same view of the facts with your Lordships, and it is on that account that I have thought it necessary to explain the grounds upon which I have come to the same result. I agree with your Lordships that it was the duty of the appellant, in carrying out his building operations, to see that reasonable precautions were taken, in order to protect from injury the eastern wall of his tenement, of which the respondent was part owner. The appellant does not deny that many of the operations which he contemplated, and had employed a contractor to execute, were such as would necessarily, or possibly, imperil the stability of the party-wall if no precautions were used, nor does he dispute that it was incumbent upon him to see that these operations were safely carried out by the contractor. What he did allege and offer to prove before the jury was, that all these hazardous operations had been brought to a safe termination months before the occurrence which resulted in damage to the respondent's house. Now, looking to the terms of the contract and specification, I think it does appear that extensive structural operations, fraught with obvious risk to the party-wall in question, had been carefully and successfully executed, and if I had been able to come to the conclusion in fact, that after these were completed, there remained nothing to be done by the contractor which would reasonably be supposed to involve danger to the party-wall, I should have been disposed to agree with Holker, L. J. I do not think that the combination in one contract of operations hazardous and operations in no reasonable sense hazardous, does affect the character of those operations, or impose upon the employer legal duties and liabilities to which he would not have been subject, had he employed a different contractor for each operation.

But I am not satisfied that the fitting up of a wooden staircase from the basement floor of the appellant's tenement to the cellar below, was an operation which could occasion no risk to the party-wall.   It was an operation which might be executed in at least two ways, either by cutting a groove in the south party-wall, and inserting in it one of the wooden stringers supporting the stair, or by leaving the wall untouched and fixing the staircase outside it.   I see no reason to doubt that the latter method would have been unattended with danger to the wall against which the stair was to be placed, or to the party-wall in which the respondent is interested.   The other method was, as the result showed, attended with serious danger to both these walls, and I cannot find any suggestion in the statement made by the appellant's counsel to the effect that no one could have reasonably anticipated that a workman might cut the wall in order to let in a stringer.   The statement which was very strongly and repeatedly made regarding it was that the cutting of the wall was unnecessary, and was not only unauthorized but positively forbidden.   Unnecessary it certainly was, because the staircase might have been securely fixed without interfering with the wall.   Unauthorized and forbidden it also was in this sense, that by the terms of the contract and relative specification the contractor was bound to leave the wall untouched.   But the terms of the contract and specification are, in my opinion, of no relevancy as in a question with the respondent.   If there were any reason to suppose that an ordinary workman entrusted with the job, might cut into the wall, the appellant took a very proper precaution when he bound his contractor not to cut it, but he failed in his duty to the respondent when he permitted the contractor and his workmen to neglect that precaution.   I am of opinion that the appellant could not establish a good defense to the respondent's claim by simply proving that it was not in the least necessary to cut the wall, and that the contractor was under an obligation not to do it.   It appears to me that he could not escape from liability unless he further proved that it could not have been reasonably anticipated that any workman of ordinary skill in such operations, who was neither insane nor dishonest, would have dreamt of cutting the wall.   I can find no allegation to that effect, nor do the statements made by the appellant's counsel

appear to me to sustain the inference that the cutting of the wall was of that improbable description. It is not said that the contractor's workmen were deficient in ordinary skill, or that their act, however ill-judged, was dictated by any other motive than a desire to perform their work efficiently. In these circumstances the only inference in fact which I can draw is, that these men ought to have been specially directed not to interfere with the wall, and that care should have been taken that they obeyed the direction. These precautions ought, no doubt, to have been taken by the contractor, but, in accordance with the principle laid down in *Bower* v. *Peate,* (*ubi sup.*,) and *Dalton* v. *Angus* (*ubi sup.*,) it was no less the duty of the appellant, as in a question with the respondent, to see that they were strictly observed.

LORD FITZGERALD.—My Lords: The question in the case seems to me rather one of controverted fact than of law. The defendant did not endeavor to escape from the principles to be deduced from *Dalton* v. *Angus,* (*ubi sup.*,) *Tarry* v. *Ashton,* (1 Q. B. Div., 314; 34 L. T. Rep., N. S., 97,) *Bower* v. *Peate,* (*ubi sup.*,) and *Pickard* v. *Smith,* (*ubi sup.*,) or to deny their applicability; and on the other hand, the plaintiff's counsel admitted the law as stated by the defendant's counsel. For the defendant it was contended that the work on which he was engaged, if originally hazardous, had ceased to be so, inasmuch as all that was hazardous had been completed, and that the particular work which was being done was not dangerous in itself, or likely to produce danger, and that the wrongful or negligent act of the workmen, which it was said caused the calamity, was entirely collateral, and wholly unauthorized. I agree with Lord Blackburn in regretting the course taken at the trial, for I cannot help thinking that, if the evidence had been fully gone into, we should probably not have heard of the case. We are now obliged to take our view of the facts from the opening statement of the defendant's counsel at the trial, and I have considerable doubt whether the real cause of the fall of the plaintiff's new house is not traceable to another and different source than that which has been assumed, and which, if ascertained as a matter of fact, might have exonerated the contractor, and rendered clear the liability of the defendant. The undertaking the defendant was engaged on was, no doubt, as a

whole perilous to his neighbors on both sides, and such as to render care and precaution necessary at every step until the whole of the new structure was substantially completed, or so far at least that nothing remained to be done which could affect the stability of either of the party-walls. Part of the original design was that the party-wall at Barron's side should be taken down and rebuilt from top to bottom. Thus we find that the specification provides, "the contractor to take down the party-wall of adjoining building in the Haymarket, and cut away all the old bricks and rubbish, grub up old foundations, and prepare levels for rebuilding new party-wall." The defendant's counsel, in one part of his statement, said: "Now, I ought to mention to you one very important fact, and it is this: there was the party-wall which stood between Barron's house and the house here, which was to be rebuilt by Mr. Hughes. This party-wall it was proposed, and assented to by Mr. Hughes, on these plans and specifications, should be entirely taken down and rebuilt. Mr. Hughes would have to be at the expense of doing so, because he was the building owner." In place of carrying out the specification the plan was departed from as to this old party-wall; it was underpinned, and then up to the first floor, about fourteen feet, left untouched, but from that point upwards a new party-wall was built on it, and necessarily of greater height and greater weight than the old wall. It was the old portion of this party-wall that gave way, and by its fall caused the fall of the defendant's house, and the displacement of the girder which was clinched into the plaintiff's party-wall, and caused the mischief of which he complained. If Barron's wall had been entirely rebuilt, as it ought to have been, it is not at all probable that the calamity would have occurred. A new brick wall has great cohesive power, and, as it would be smooth, no chipping or hacking would be necessary to fit on the stairs, and it would probably be unaffected by chipping or hacking, and even cutting into it to fit the wooden staircase or stone steps would not affect its stability so as to create danger. As to the old wall it was different; it was of unknown antiquity, and the part that was left seems to have been weak, out of plumb, with an uneven and rough front, which, according to specification, was to be hacked off and leveled, and it had a great superincumbent weight of new work

placed on it. It yielded from its inherent weakness to the cut-
ting and shaking it received in the process of fixing the
wooden and stone steps, and came down. It is thus described:
"Then from the first floor up to the second floor, it was in-
tended to have a flight of stone steps, the ends to be let into
the wall from which they depend, pinned into the wall; that
involves of course cutting into the wall a sufficient depth, and
plugging up the holes after you have got the end of the step
in. But they began at the bottom, and got the bottom step
with the door on the floor mortised or let into the wall, pinning
it into the wall properly at one end and filling that up with
cement, and then the next step is fixed above it, and the next
above that, and so you go on according to the slope at which
your staircase rises. The men were fixing on the day of the
accident this flight of stone steps. But independently of that
the men who were employed by the carpenters were also fixing
a flight of steps which led down into the basement, wooden
steps, and without any knowledge of the foreman of the works,
and without any order from him, without any knowledge at
all of either of the architects, or anything shown on the plans
to that effect or prescribed in the specification, the workmen
had, on his own head, and, as it were, utterly unauthorized,
cut into the wall below the level of the ground floor; that is to
say, the lower portion of the party wall which had been left,
he cut into it." Then the fall is described: "The whole ap-
peared to collapse in the center, to go down, no doubt partly or
chiefly put in motion by the fact that this party-wall had been
by the unauthorized act of the workmen unduly and improp-
ly weakened; that had set the thing going and the girder gave
way, the wall gave way, and the collapse took place as I have
described." The act of the workmen may have been unau-
thorized and ill-judged, but it was an act no doubt done in the
execution of the work entrusted to them, and can in no sense
be said to have been entirely collateral; and it is not to be for-
gotten that the contract provides that "complete copies of the
drawings and specifications are to be kept in the buildings in
charge of a competent foreman, who is to be constantly kept on
the ground by the contractors, and to whom instructions can
be given by the architect," who of course, is to direct the work-
men in their operations, and ought to see that what they are

doing is necessary and lawful, and carried out in the safest manner. Then, was the perilous portion of the work completed before the doing of the act which it is said led immediately to the fall of Barron's party-wall, and the consequent injuries to plaintiff's house? I should have answered that question in the negative without any hesitation if it had not been for the opinion expressed by Holker, L. J., which I receive with the utmost respect. The event shows that the danger was not over, and I should have thought that it could not be as long as anything was being done that could affect the stability of either party-wall. Holker, L. J., seems to have been of opinion that, though the operation as a whole was perilous, yet that the peril had ceased, though the work was not completed. He says, as to the particular portion of the work: "It seems to me perfectly clear that it was not hazardous work, and the work-men exceeded their duty; they made a mistake." But is it open to us to divide the work thus into sections, and to say as to a particular part taken by itself, that it carried with it no special peril, and that defendant is not responsible? It seems to me this cannot be done. We should not be justified in thus breaking it into parts, or considering the case as if the putting in the stairs or the stone steps was the sole work which the defendant was getting done. The conclusion I have reached is, that the defendant had undertaken a work which, as a whole, necessarily carried with it considerable peril to his neighbors. In the execution of that work, the party-wall at Barron's side was so injured that it fell in, and its fall dragged down the new building, and injured the plaintiff's party-wall and premises. What is the law applicable? What was the defendant's duty? The law has been verging somewhat in the direction of treating parties engaged in such an operation as the defendant as insurers of their neighbors, or warranting them against injury. It has not, however, reached quite to that point. It does declare that under such a state of circumstances, it was the duty of the defendant to have used every reasonable precaution that care and skill might suggest in the execution of his works so as to protect his neighbors from injury, and that he cannot get rid of the responsibility thus cast on him by transferring that duty to another. He is not in the actual position of being responsible for injury no matter how occa-

sioned; but he must be vigilant and careful, for he is liable for injuries to his neighbors caused by any want of prudence or precaution, even though it may be *culpa levissima.* It seems to me that the peril to the plaintiff's house continued as long as there remained anything to be done which could interfere with the stability of the girder on which the defendant's house rested, which the defendant had fastened into the plaintiff's party-wall, and that there was that want of due supervision and due precaution which makes the defendant liable.

Order appealed from affirmed, and appeal dismissed with costs.